## UNITED STATE BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  EDWARD D. CRESPIN and
       JANIS M. CRESPIN,                                  Case No. 14-13751-j7

               Debtors.

DAVID SANDERS and
DORIE SANDERS,

        Plaintiffs,

        v.                                           Adv. No. 15-01028-j

EDWARD D. CRESPIN and
JANIS M. CRESPIN,

        Defendants.

### <u>MEMORANDUM OPINION</u>

Plaintiffs/Creditors, David and Dorie Sanders, object to the dischargeability of debt pursuant to 11 U.S.C. §§ 523(a)(2)(A), (4) and (6).  The heart of the dispute relates to a 1997 Patriot Home, Serial # 2PTX906B/ATX (the "Mobile Home") that Mr. and Mrs. Sanders purchased from Defendants/Debtors, Edward D. Crespin and Janis M. Crespin, and what Mr. and Mrs. Crespin said, or did not say, to Mr. and Mrs. Sanders during that transaction.  After consideration of the evidence, arguments of counsel and applicable law, the Court has determined that the debt Mr. and Mrs. Crespin owe Mr. and Mrs. Sanders arising out of that transaction is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and that a state court judgment fixes the amount of the debt.

**Procedural History**

*The Underlying Bankruptcy Case*

On December 31, 2014, Mr. and Mrs. Crespin filed their voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  *See* Bankruptcy Case No. 14-13751-j7, Docket No. 1.  On February 26, 2015, Green Tree Servicing, LLC ("Green Tree") filed a Motion for Relief from the Automatic Stay (the "Motion for Relief from Stay").  *See* Motion for Relief from Stay, Bankruptcy Case No. 14-13751-j7, Docket No. 15.  In the Motion for Relief from Stay, Green Tree alleged that Mr. and Mrs. Crespin were $3,516.16 in arrears on an $84,478.75 obligation evidenced by a promissory note secured by a mortgage and security agreement that encumbered both the Mobile Home and certain real property.[1]  *See id.* at p. 3.  On April 3, 2015, the Court entered a Default Order granting the Motion for Relief from Stay, and allowing Green Tree to enforce its rights under its mortgage and security agreement.  *See* Bankruptcy Case No. 14-13751-j7, Docket No. 18.  On April 21, 2015, the Court entered an order granting Mr. and Mrs. Crespin a discharge under 11 U.S.C. § 727.  *See* Bankruptcy Case No. 14-13751-j7, Docket No. 20.  A week later, Mr. and Mrs. Crespin's bankruptcy case was closed, leaving this adversary proceeding as the lone pending matter associated with the bankruptcy case.

*The Adversary Proceeding*

On March 27, 2015, Mr. and Mrs. Sanders initiated this adversary proceeding by filing the Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2), (4) and (6) (the "Complaint").  *See* Docket No. 1.  Mr. and Mrs. Crespin timely filed an answer to the

---

[1] The promissory note and the mortgage and security agreement referred to in the Motion for Relief from Stay are the promissory note and the mortgage and security agreement at the center of this adversary proceeding and are more completely described below.

Complaint.  *See* Docket No. 5.  On July 10, 2015, Mr. and Mrs. Crespin consented to the Court

hearing and finally determining all issues in this adversary proceeding.  *See* Consent or Refusal to

Consent to the Bankruptcy Court Hearing and Determining Claims, Docket No. 11.

## **FINDINGS OF FACT**

In accordance with Fed. R. Civ. P 52(a)(1), made applicable by Fed. R. Bankr. P. 7052, the

Court finds the following facts.

Jennifer Montoya owned the Mobile Home before she sold it to Mr. and Mrs. Crespin.  The

Mobile Home was personal property.  It was not affixed to the land.  On February 6, 1997, she

executed and delivered to Green Tree Financial Servicing Corporation a Universal Note (the

"Note") in the original principal amount of $109,617.59.  *See* Exhibit 1.  To service the Note, Ms.

Montoya also executed a Line of Credit Mortgage (the "Mortgage and Security Agreement")

encumbering both the Mobile Home and real property she owned located in Rio Rancho, New

Mexico[2] (the "Real Property").  *See* Exhibit 2.  The Mortgage and Security Agreement provides

that "[t]he total unpaid balance secured by this mortgage at any one time shall not exceed a

maximum principal amount of [$109,617.59], plus interest, plus any amounts dispersed under the

terms of this mortgage to protect the security of this mortgage or to perform any of the covenants

contained in this mortgage with interest on such disbursement."

On July 24, 2001, Ms. Montoya and Mr. and Mrs. Crespin entered into a Purchase

Agreement (the "Purchase Agreement") providing for Mr. and Mrs. Crespin to purchase the

Mobile Home and the Real Property from Ms. Montoya subject to the Mortgage and Security

---

[2] The Real Property is identified in the Mortgage as 1504 Abrazo Road, Rio Rancho, NM and further described as "LOT NUMBERED TWO (2) IN BLOCK THIRTY-EIGHT (38), UNIT 11, RIO RANCHO ESTATES, AS THE SAME IS SHOWN AND DESIGNATED ON THE PLAT ENTITLED, 'NORTHERLY PORTION OF N.E. PORTION OF UNIT ELEVEN, RIO RANCHO ESTATES, TOWN OF ALAMEDA GRANT, SANDOVAL COUNTY, NEW MEXICO,' FILED IN THE OFFICE OF THE COUNTY CLERK OF SANDOVAL COUNTY, NEW MEXICO, ON APRIL 22, 1963 IN RIO RANCHO ESTATES PLAT BOOK NUMBER 1, PAGE 50."  *See* Exhibit 2, p. 5.

- 3 -

Agreement.[3]  Pursuant to the Purchase Agreement, Mr. and Mrs. Crespin made a down payment of $2,000.00 to Ms. Montoya and agreed to assume the Note.  A few days later, Ms. Montoya, Mr. and Mrs. Crespin, and Conseco Finance Servicing Corporation executed an Assumption-Agreement for Land-and-Home Loan and Related Mortgage (the "Assumption Agreement").  *See* Exhibit 7.  Pursuant to the Assumption Agreement, Mr. and Mrs. Crespin purchased the Mobile Home and the Real Property[4] from Ms. Montoya subject to the Mortgage and Security Agreement. Mr. and Mrs. Crespin also assumed Ms. Montoya's obligations under the Note, which then had a total principal balance of $106,083.80.

Sometime prior to 2006, Green Tree became the owner and holder of the Note.  Mr. and Mrs. Crespin decided to sell the Mobile Home in late 2006 after residing there approximately six years.  At that time, Mrs. Crespin contacted Green Tree and inquired into how she could obtain a release of the lien against the Mobile Home granted in the Mortgage and Security Agreement.  A representative of Green Tree informed Mrs. Crespin that the lien against the Mobile Home would be released only upon payment in full of the balance of the Note secured by both the Mobile Home and Real Property.  Mr. and Mrs. Crespin planned to obtain a construction loan large enough not only to build their dream home on the Real Property, but also to pay off the balance of the Note and obtain a release of the Mortgage and Security Agreement.  However, Mr. and Mrs. Crespin had poor credit and needed to substantially improve their credit score to have any realistic chance

---

[3] The Purchase Agreement (Transfer of Equity) is dated July 24, 2001 but was not executed by Mr. and Mrs. Crespin until July 31, 2001 and by Ms. Montoya until August 6, 2001.

[4] The Real Property is identified in the Assumption Agreement as 607 Abrazo Rd, Rio Rancho, NM 87124 and is further described as "Lot numbered Two (2) in Block numbered Thirty-eight (38), unit 11, as the same is shown and designated on the plat entitled, 'NORTHERLY PORTION OF N.E. PORTION OF UNIT ELEVEN, RIO RANCHO ESTATES, TOWN OF ALAMEDA GRANT, SANDOVAL COUNTY, NEW MEXICO,' filed in the office of the County Clerk of Sandoval County, New Mexico, on April 22, 1963 in Rio Rancho Estates Plat Book Number 1, page 50.  Based on the property descriptions found in the Mortgage and the Assumption Agreement and the testimony of Mr. and Mrs. Crespin, the Court finds that the real property identified as 607 Abrazo Rd in the Assumption Agreement is the same real property that was identified as 1504 Abrazo Road in the Mortgage.

- 4 -

of obtaining a construction loan. They intended to retain a company to help them repair their credit. Mr. and Mrs. Crespin believed they would be able to repair their credit, obtain the construction loan, and free up title to the Mobile Home. However, Mr. and Mrs. Crespin did not attempt to obtain a construction loan or improve their credit score before listing the Mobile Home for sale for $45,000.00 in a local classified publication.

Around late December 2006, Mr. and Mrs. Sanders saw Mr. and Mrs. Crespin's classified advertisement and were interested in purchasing the Mobile Home. Mrs. Sanders contacted Mr. Crespin and set a time for Mr. and Mrs. Sanders to view the Mobile Home. Mr. and Mrs. Sanders met Mr. and Mrs. Crespin at the Mobile Home and Mr. and Mrs. Crespin gave Mr. and Mrs. Sanders a tour. At this meeting, Mr. and Mrs. Crespin discussed their intention to build their dream home on the Real Property and showed Mr. and Mrs. Sanders their house plans. Mr. and Mrs. Sanders liked what they saw of the Mobile Home, informed Mr. and Mrs. Crespin of their desire to purchase the Mobile Home from Mr. and Mrs. Crespin at their asking price of $45,000.00, and gave Mr. and Mrs. Crespin a check for $500.00 as a down payment of the purchase price. The parties agreed to meet soon to execute a formal purchase agreement that Mr. and Mrs. Crespin would prepare. The purchase price of the Mobile Home was not nearly enough to pay off the Note.

On January 13, 2007, the parties met at a local restaurant to execute a purchase agreement. Mrs. Crespin created an Agreement to Sell Personal Property (the "First Contract") by editing a form she found online. *See* Exhibit 11. In the First Contract, "[t]he parties agree[d] to transfer title on April 23, 2007[], at the address of the Seller." Exhibit 11, ¶ 5. The First Contract also provides that Mr. and Mrs. Sanders were to deliver the remainder of the purchase price at closing.

The parties met at a credit union in Rio Rancho on April 24, 2007, where they executed a second Agreement to Sell Personal Property (the "Second Contract"), which was identical to the

First Contract. *See* Exhibit 13. Following their execution of the Second Contract, the parties executed a document entitled Receipt (the "Receipt"), which was also drafted by Mrs. Crespin. By signing the Receipt, Mr. and Mrs. Crespin acknowledged receipt of the remaining $44,500.00 of the purchase price, which Mr. and Mrs. Sanders paid by certified check. *See* Exhibits 12 and 14. Paragraph 3 in the First Contract, Second Contract, and Receipt are identical. Paragraph 3 states: "Seller warrants it has good and legal title to said property, full authority to sell said property, and that said property shall be sold by warranty bill of sale free and clear of all liens, encumbrances, liabilities and adverse claims of every nature and description whatsoever." Exhibit 11, ¶ 3; Exhibit 12, ¶ 3; Exhibit 13, ¶ 3. Paragraph 5 of the Receipt provides "[t]he parties agree to transfer title within 60 days at the address of the Seller." Exhibit 14, ¶ 5.

Mr. and Mrs. Crespin added Paragraph 5 to the Receipt to conceal from Mr. and Mrs. Sanders the fact that title to the Mobile Home was encumbered and to allow them time to obtain a construction loan for their dream home. Mr. and Mrs. Crespin needed the construction loan to borrow sufficient additional funds to pay off the lien against the Mobile Home and deliver free and clear title to Mr. and Mrs. Sanders. However, Mr. and Mrs. Crespin did not disclose to Mr. and Mrs. Sanders that they had bad credit and needed to obtain a construction loan to build a house and obtain sufficient funds to deliver free and clear title to the Mobile Home. Mr. and Mrs. Sanders did not ask Mr. and Mrs. Crespin about the reason for adding Paragraph 5 to the Receipt. Mr. Sanders assumed that 60 days was a reasonable length of time to wait for receipt of the title to the Mobile Home because he believed it would be necessary for paperwork to be completed changing the name on the title. Mr. and Mrs. Sanders did not obtain a title search for the Mobile Home because they believed it was personal property and that title searches are only necessary or useful when purchasing real property.

By not disclosing that they had bad credit and needed to obtain a construction loan to deliver clear title to the Mobile Home, Mr. and Mrs. Crespin intended to create and foster a false impression that Mr. and Mrs. Sanders bore no material risk with respect to obtaining clear title to the Mobile Home and that it was just a matter of doing the paperwork to change the name on the title. The Court infers from the circumstances that Mr. and Mrs. Crespin's failure to disclose was done with intent to deceive Mr. and Mrs. Sanders. Mr. and Mrs. Crespin knew that Green Tree would not release its lien against the Mobile Home without payment of the Note in full, that the Note balance substantially exceeded the sale price of the Mobile Home, and that, in light of their bad credit score, there was a material risk they could not obtain the construction loan within 60 days or anytime thereafter. Nevertheless, Mr. and Mrs. Crespin completed the sale of the Mobile Home and took Mr. and Mrs. Sanders's money without disclosing these facts.

Mr. and Mrs. Sanders were unsophisticated with respect to the purchase and sale of mobile homes. They did not know that a search of the real property records could reveal a lien against the Mobile Home if a loan had been collateralized by both the Mobile Home and real estate. They did not consider the possibility of reviewing the real property records, which may have revealed the Mortgage and Security Agreement. Further, Mr. and Mrs. Sanders did not have familiarity with the process of transferring title to a mobile home. Mr. and Mrs. Sanders justifiably relied on the information supplied by Mr. and Mrs. Crespin in their conversations and in the documents executed by the parties, including paragraph 3 of the documents and paragraph 5 of the Receipt, in deciding to proceed with the transaction. Mr. and Mrs. Sanders had no reason to suspect that Mr. and Mrs. Crespin were being untruthful or withholding material information.

By summer 2007, Mr. and Mrs. Sanders took possession of the Mobile Home and relocated it to a tract of real property they owned. When Mr. and Mrs. Sanders had not received title to the

Mobile Home by late fall 2008, they became worried. They searched the recorded property records for the Mobile Home and soon discovered the existence of the Mortgage and Security Agreement. Distraught, Mr. and Mrs. Sanders contacted Green Tree and spoke with one of its representatives. After failing to reach any solution with Green Tree, Mr. and Mrs. Sanders filed an action against Mr. and Mrs. Crespin in New Mexico state court.

*The State Court Action*

On December 22, 2009, Mr. and Mrs. Sanders commenced a New Mexico state court action (the "State Court Action") against Mr. and Mrs. Crespin asserting claims for specific performance, breach of contract, fraudulent misrepresentation, negligent misrepresentation, and violation of the New Mexico Unfair Practices Act. *See* Exhibit 19. The transactions upon which the complaint is based consist of the purchase and sale of the Mobile Home, Mr. and Mrs. Crespin's failure and inability to deliver title to the Mobile Home free and clear of liens, and the representations and warranties Mr. and Mrs. Crespin made to Mr. and Mrs. Sanders relating to the sale transaction. Mr. and Mrs. Sanders sought judgment against Mr. and Mrs. Crespin for actual and punitive damages, court costs, attorney's fees, and pre- and post-judgment interest. *See id.* at p. 10. Mr. and Mrs. Crespin did not file a timely response to the complaint in the State Court Action, and the state court entered a default judgment (the "Default Judgment") against Mr. and Mrs. Crespin on November 18, 2010. The state court made the following findings of fact in the Default Judgment:

> The Court entered into its Entry of Default on July 14, 2010, finding that the Defendants failed to answer the Plaintiff's Complaint for Specific Performance, Breach of Contract, Fraudulent Misrepresentation, Negligent Misrepresentation, Violation of the New Mexico Unfair Practices Act, and Punitive Damages, and have no meritorious defense in failing to answer.

*Id.* The state court awarded Mr. and Mrs. Sanders a total judgment of $162,290.00, which breaks down as follows:

- 8 -

| | |
|---|---|
| Compensatory Damages (value of the Mobile Home) | $45,000.00 |
| Pre-Judgment Interest | $21,832.45 |
| Filing Fee | $282.00 |
| Service of Process Fee | $217.05 |
| Attorney's Fees | $4,958.50 |
| Treble Damages (2 x Compensatory Damages) | $90,000.00 |
| **Total: $162,290.00** | |

*See* Exhibit 20.

A little over six months after entry of the Default Judgment, Mr. and Mrs. Crespin, by counsel, filed a motion to set aside the Default Judgment in the State Court Action. *See* Exhibit 21. Approximately two months later, the state court entered an order denying the motion. *See* Exhibit 22. Mr. and Mrs. Sanders recorded a transcript of the Default Judgement with the County Clerk for Sandoval County, New Mexico (Document Number 2014073426). *See* Exhibit 23. On December 16, 2014, Mr. and Mrs. Sanders served writs of garnishment on Sandia Area Credit Union and Mr. and Mrs. Crespin's respective employers. The following day, Mr. and Mrs. Crespin, acting *pro se*, filed a second motion to set aside the Default Judgment. *See* Exhibit 25.

*Status of the Note*

Mr. and Mrs. Crespin made payments to Green Tree totaling $77,077.00 between April 2007 and December 2014. Mr. and Mrs. Crespin discontinued making payments on the Note after Mr. and Mrs. Sanders garnished their bank account and wages. As of February 20, 2015, the balance of the Note was $84,478.75.

*Status of the Payment Mr. and Mrs. Crespin Received from Mr. and Mrs. Sanders and the
Construction Loan*

Mr. and Mrs. Crespin spent the $45,000.00 they received from Mr. and Mrs. Sanders to pay various expenses, including servicing the Note and paying other debts and general living expenses. Following their sale of the Mobile Home to Mr. and Mrs. Sanders, Mr. and Mrs. Crespin

- 9 -

made substantial efforts to improve their creditworthiness as a means of obtaining a construction loan for their dream home that would pay off the Note. Mr. and Mrs. Crespin still hoped to obtain a construction loan that would enable them to deliver clear title to the Mobile Home to Mr. and Mrs. Sanders. Mr. and Mrs. Crespin abandoned their efforts to obtain a construction loan by late 2008 because of their continuing financial problems. Mr. and Mrs. Crespin's financial struggles were caused or exacerbated by periods of unemployment and under employment, failed businesses, and medical expenses for their disabled child. Mr. and Mrs. Crespin have listed the Real Property for sale at $60,000.00 in an attempt to pay down the balance of the Note.

*Status of the Title to the Mobile Home*

At all times relevant to this matter, the Mobile Home was not affixed to the Real Property. The Mobile Home is titled as a mobile home. At the time Mr. and Mrs. Sanders purchased the Mobile Home and continuously thereafter, Green Tree has had physical possession of the title to perfect its lien against the Mobile Home. Mr. and Mrs. Crespin have not obtained title to the Mobile Home.

## DISCUSSION

Mr. and Mrs. Sanders assert that the debt arising under the Default Judgment is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (4) and (6), and argue that the Default Judgment is conclusive of the amount of the non-dischargeable debt. Mr. and Mrs. Crespin assert that Mr. and Mrs. Sanders's claim is not excepted from discharge because they had every intention of delivering title to the Mobile Home but that a series of unfortunate events prevented them from fulfilling their intention. Alternatively, Mr. and Mrs. Crespin argue that the Court should make an independent determination of the amount of the non-dischargeable debt. The Court will begin its analysis by examining the preclusive effect of the Default Judgment and then will address the non-

- 10 -

dischargeability of the debt, but before doing so will explain its use of the terms "res judicata" and "claim preclusion."

A.     Use of the terms res judicata and claim preclusion

Use of the term res judicata has not been not consistent in the case law.  The inconsistency has sometimes caused confusion in legal discourse on the subject.  *Martin-Bargura v. Virginia Dept. of Mental Health*, 640 F. Supp. 729, 734 (E.D. Va. 2009).  The Supreme Court has clarified that under federal common law, res judicata is a term that encompasses both claim preclusion and issue preclusion.  *Taylor v. Sturgell*, 553 U.S. 880 (2008) ("The preclusive effect of a [federal court] judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'").  "Claim preclusion describes the rules formerly known as 'merger' and 'bar,' while issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'" *Id*. at 271 n 5.  In bankruptcy court, the general rule is that the court "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  *See also In re Griego*, 64 F.3d 580, 584 (10th Cir. 1995) (citing *DePaolo v. United States* (*In re DePaolo*), 45 F.3d 373, 376 (10th Cir. 1995).  The Default Judgment was rendered by a New Mexico state court.  Many states, including New Mexico, equate res judicata with claim preclusion and use those terms interchangeably.  *See, e.g. Campbell v. City of Spencer*, 777 F.3d 1073, 1077 (10th Cir. 2014); (claim preclusion is also known as res judicata under Oklahoma law); *Brannock v. Lotus Fund*, 367 P.3d 888, 896 (N.M. Ct. App. 2015) (equating claim preclusion with res judicata).  For clarity, in this opinion the Court will use the term "res judicata" followed by "claim preclusion" in brackets to refer to claim preclusion when quoting or

discussing an opinion that uses res judicata to mean the same thing as claim preclusion. The Court otherwise will refer to the doctrine as claim preclusion.

B.     <u>Applicability of claim preclusion to this dischargeability proceeding</u>

It is well established that findings of fact made in rendering a final state court judgment can be given preclusive effect in a subsequent adversary proceeding to determine non-dischargeability of a debt where the issues of fact were actually litigated.[5] This case raises a different question: in a dischargeability proceeding should the state court Default Judgment be given preclusive effect to fix the existence and amount of the debt?[6] This question will be answered in two parts: first, the Court will address the applicability of the doctrine of claim preclusion in this dischargeability proceeding; and second, the Court will address whether and to what extent the Default Judgment should be given preclusive effect.

<em>The import of Brown v. Felsen</em>

Mr. and Mrs. Crespin argue that under *Brown v. Felsen*, 442 U.S. 127, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979), claim preclusion does not apply in dischargeability proceedings. They reason that because the state court judgment is a default judgment not entitled to collateral estoppel effect, and because claim preclusion does not apply in dischargeability proceedings, the Default Judgment has no preclusive effect in this adversary proceeding. There is support for the

---

[5] *See Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (acknowledging that "[v]irtually every court of appeals has concluded that collateral estoppel is applicable in discharge exception proceedings . . ." and clarifying "that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).") (citations omitted). *See also Klemens v. Wallace* (*In re Wallace*), 840 F.2d 762, 764 (10th Cir. 1988) ("the doctrine of collateral estoppel may be invoked to bar relitigation of the factual issues underlying the determination of dischargeability."); *Taylor v. Jasper* (*In re Jasper*), 356 B.R. 787, 2007 WL 390287, at *3 (10th Cir. BAP 2007) ("Collateral estoppel may be applied in bankruptcy proceedings to determine dischargeability of a debt.") (citation omitted)

[6] Under New Mexico law, collateral estoppel does not apply to a default judgment because the issues were not actually litigated. *See Shovelin v. Cent. New Mexico Elec. Co-op., Inc.*, 850 P.2d 996, 1000 (N.M. 1993) (one of the elements of collateral estoppel is that "the issue was actually litigated in the prior adjudication").

- 12 -

proposition that claim preclusion does not apply in dischargeability proceedings.[7]   A close examination of *Brown v. Felsen*, however, shows that it addresses only whether res judicata [claim preclusion] applies to the bankruptcy court's determination of whether a debt is dischargeable. *Brown v. Felsen* is silent regarding whether, in a dischargeability proceeding, res judicata [claim preclusion] can establish the existence and amount of the debt under non-bankruptcy law.

In *Brown v. Felsen*, a creditor filed a dischargeability proceeding in bankruptcy court after the creditor had obtained a state court judgment against the debtor resulting from a settlement between the parties.   The state court judgment did not identify the cause of action on which the judgment was based or contain a finding of fraud or dishonesty.   In the dischargeability proceeding, the creditor asserted that its state court judgment was the product of fraud and sought to have it declared non-dischargeable.   The debtor argued that the "prior state-court proceeding did not result in a finding of fraud, and contended that res judicata [claim preclusion] barred relitigation of the nature of [the debtor's] debt to [the creditor]."  *Id.* at 129.   The Supreme Court determined that res judicata [claim preclusion] does not apply "when considering the dischargeability of debt."   *Id.* at 139.[8]  The Supreme Court stressed that the bankruptcy court has exclusive jurisdiction to determine the nature of a debt for dischargeability purposes, and concluded that applying res judicata [claim preclusion] to the dischargeability decision would undercut that jurisdiction.  *Id.* at 135-36.   *Brown v. Felsen* does not hold or suggest that claim preclusion is never applicable in dischargeability

---

[7] *See, e.g., In re Walker*, 416 B.R. 449, 462 (Bankr. W.D.N.C. 2009) ("In *Brown v. Felsen*, the U.S. Supreme Court held res judicata [claim preclusion] is inapplicable to a bankruptcy dischargeability proceeding," although like in *Brown v. Felsen* the debtor relied on claim preclusion); *In re Lucas*, 186 B.R. 67, 69 (Bankr. E.D. Va 1995) (claim preclusion is inapplicable in dischargeability proceedings).

[8] In *Brown v. Felsen*, the Supreme Court used the term res judicata to examine whether claim preclusion prevented the bankruptcy court from determining whether the debt reduced to judgment in state court was non-dischargeable. *See Brown v. Felsen, 442 U.S. at* 139 n. 10 ("This case concerns res judicata only, and not the narrower principle of collateral estoppel.   Whereas res judicata forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit.").

proceedings. The Supreme Court made it clear that it was not addressing the preclusive effect of the state court judgment with respect to the existence and amount of the debt:

> [P]etitioner readily concedes that the prior decree is binding. That is the cornerstone of his claim. He does not assert a new ground for recovery, nor does he attack the validity of the prior judgment. Rather, what he is attempting to meet here is the new defense of bankruptcy which respondent has interposed between petitioner and the sum determined to be due him.

442 U.S. 133.

*A state court judgment is entitled to claim preclusion effect to establish the existence and amount of the debt in a dischargeability proceeding*

Starting with a review of some basic claim preclusion concepts consistent with New Mexico law will inform the Court's analysis of whether and to what extent claim preclusion applies in this dischargeability proceeding. New Mexico has adopted Restatement (Second) of Judgments §§ 24 and 25, has applied § 26, and generally looks to Restatement (Second) of Judgments for guidance.[9] Under the doctrine of claim preclusion, with limited exceptions, "[i]f [a] judgment is in favor of the plaintiff, the claim is extinguished and merged in the judgment and a new claim may arise on the judgment." Restatement (Second) of Judgements § 17(1). The definition of a claim is transaction based; it is not based on the theory of recovery. "[T]he claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgements § 24(1). A claim "encompasses all claims to relief under any theory."

---

[9] *Moffat v. Branch*, 118 P.3d 732, 736 (N.M. Ct. App. 2005) ("Federal law and New Mexico law are not divergent on claim preclusion doctrine, and both find the Restatement (Sec*ond) of Judgments (1982) [hereinafter Restatement ], persuasive."); Phoenix Funding, LLC v. Aurora Loan Services, LLC,* 365 P.3d 8, 18 (N.M. Ct. App. 2015) ("New Mexico decisions have not adopted every principle set forth in the most recent version of the Restatement, however, our precedent is consistent with the Restatement in many aspects and we continue to look to the Restatement for guidance regarding relief from judgments."). *See also Three Rivers Land and Cattle Co., Inc. v. Maddoux,* 652 P.2d 240 (N.M. 1982) (adopting Restatement (Second) of Judgment §§ 24 and 25*), overruled in part on other grounds by Universal Life Chruch v. Coxon,* 728 P.2d 467 (N.M. 1986); *Concerned Residents of S.F. North v. Santa Fe Estates, Inc.,* 182 P.3d 794, 801 (N.M. Ct. App. 2008) (applying Restatement (Second) of Judgments §§ 24 and 26).

- 14 -

Restatement (Second) of Judgements § 24, comment a. An exception to the prohibition against splitting claims is where the court in the first action could not grant a certain remedy or grant certain relief because of limitations on the court's jurisdiction or authority. Restatement of Judgements (Second) § 26(c).

Applying these claim preclusion principles to this adversary proceeding, Mr. and Mrs. Sanders's claim based on the series of connected transactions alleged in the state court complaint was extinguished and merged into the Default Judgment, leaving Mr. and Mrs. Sanders with a claim on the Default Judgment. *See* Restatement (Second) of Judgements §§ 17(1) and 24. That surviving claim on the Default Judgment is the claim on the debt that Mr. and Mrs. Sanders seek to except from the bankruptcy discharge. Because the state court did not have jurisdiction to determine the dischargeability of the debt in a bankruptcy case, however, merger of the claim into the Default Judgment did not extinguish the non-dischargeability claim. *See* Restatement of Judgements (Second) § 26(c). In the dischargeability proceeding, therefore, under traditional claim preclusion principles there remain two claims: a claim on the debt (on the Default Judgment) and a claim of non-dischargeability of that debt. The Default Judgment is given preclusive effect under claim preclusion as to the claim on the debt. No preclusive effect is given to the claim of non-dischargeability.

Giving the Default Judgment preclusive effect as to the claim on the debt but not as to its dischargeability is consistent with Tenth Circuit precedent and *Brown v. Felsen*, and is mandated by the Full Faith and Credit Act, 28 U.S.C. § 1738. The Tenth Circuit has determined that "[i]n bankruptcy court there are two separate and distinct causes of action: 'One cause of action is on the debt and the other cause of action is on the dischargeability of that debt, a cause of action that

- 15 -

arises solely by virtue of the Bankruptcy Code and its discharge provisions.'" [10]  *In re McKendry*,

40 F.3d 331, 336 (10th Cir. 1994) (quoting *Brockenbrough v. Taylor (In re Taylor),* 54 B.R. 515,

517–18 (Bankr.E.D.Va.1985) (which in turn quoted 3 *Collier on Bankruptcy*, ¶ 523.11 at 523–75

n. 9 (15th ed. 1985)).

     *Brown v. Felsen* teaches that the claim preclusion effect of a state court judgment does not

extend to the claim of dischargeability of a debt because whether a debt is excepted from the

discharge is within the exclusive jurisdiction of the bankruptcy court and could not have been

raised in the state court action.  442 U.S. at 135.  Unlike the issue in *Brown v. Felsen*, which was

whether a state court judgment could preclude the bankruptcy court from determining whether the

debt was non-dischargeable, applying claim preclusion to a prior state court judgment to establish

a debt under non-bankruptcy law does not invade the exclusive jurisdiction of the bankruptcy court

to decide the claim of non-dischargeability. [11]

     "'The Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal court to give the same

preclusive effect to a state-court judgment that the judgment would be given in the courts of the

state in which the judgment was rendered.'"  *Havens v. Johnson*, 783 F.3d 776, 785, n. 6 (10th Cir.

2015) (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415–16 (10th Cir.2004)).    This

---

[10]   With respect to the doctrine of claim preclusion, the terms "cause of action" and "claim" can be used interchangeably.  Restatement (First) of Judgments uses the term "cause of action" while Restatement (Second) of Judgments uses the term "claim."  *Compare* Restatement (First) of Judgments, § 62 (using the term "cause of action") *with* Restatement (Second) of Judgments, § 25 (using the term "claim").

[11]   *In re Comer*, 723 F.2d 737, 740 (9th Cir. 1984) ("[A]pplying res judicata [claim preclusion] to bar the bankruptcy court from looking behind the default judgment to determine the actual amount of the obligation would not preclude the exercise of the bankruptcy court's exclusive jurisdiction to determine the nature of the subject debt for purposes of dischargeability."); *See also In re McKenna*, 4 B.R. 160, 162 (Bankr. N.D. Ill. 1980) ("Where a judgment has been entered in a non-bankruptcy court prior to the filing of a petition in bankruptcy, this Court's function and responsibility, upon proper Complaint, is to determine the dischargeability of debt evidenced by the judgment. Under the doctrine of res judicata [claim preclusion] a judgment, even though obtained by default, is conclusive as to the cause of action upon which suit was based.").

- 16 -

requirement extends to giving preclusive effect to a state court judgment to establish the claim on the debt in a dischargeability proceeding. In *Heckert*, the Fourth Circuit explained:

> In sum, the authority granted the bankruptcy court under 28 U.S.C. § 157(b)(1) and 11 U.S.C. § 105(a) to enter orders, and the authority granted by 28 U.S.C. § 1334(b), 11 U.S.C. § 523(a) and Bankruptcy Rule 4007 to determine the dischargeability of a debt does not either explicitly or implicitly amend the provisions of 28 U.S.C. § 1738, which requires the courts of the United States to give full faith and credit to the judgments of state courts.

*In re Heckert*, 272 F.3d 253, 260 (4th Cir. 2001).[12]

Other courts have held that claim preclusion applies with respect to the claim on the debt in dischargeability proceedings but not to the claim of non-dischargeability of the debt. *See e.g., Neal v. Neal*, 124 F.3d 198 (Table), 1997 WL 525366 at *3 (6th Cir. 1997) (unpublished); *In re Comer*, 723 F.2d at 740 (in a dischargeability proceeding, "res judicata [claim preclusion] barred the bankruptcy court from looking behind the default judgment to determine the actual amount of the obligation."). This Court is persuaded that this is the more well-reasoned approach. If (a) the Default Judgment is entitled to claim preclusion effect under New Mexico law, (b) the Default Judgment is based only on the same series of connected transactions underlying the claim of non-dischargeability, and (c) this Court determines that the debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), then the claim preclusion effect of the Default Judgement will determine the existence and amount of the non-dischargeable debt. However, because the State Court Action was not actually litigated, under New Mexico law the Default Judgment has no preclusive effect to establish issues of fact.[13]

---

[12] *Cf. In re Putman*, 332 B.R. 619 625 (10th Cir. BAP 2005) (under the Full Faith and Credit Act, a bankruptcy judge determines whether a debt is nondischargeable under § 523, a state court judgment may preclude the relitigation of settled facts under the collateral estoppel doctrine).

[13] *See* note 6 above.

*The Claim Preclusion Effect the Default Judgment under New Mexico Law*

Next, the Court will determine whether the Default Judgment would be given claim preclusion effect under New Mexico law. Under New Mexico law, claim preclusion bars relitigation of a claim if four elements are met: (1) identity of parties or privies; (2) identity of capacity or character of persons for or against whom the claim is made; (3) the same cause of action; and (4) the same subject matter. *Brannock v. Lotus Fund*, 367 P.3d 888, 896 (N.M. Ct. App. 2015). [14] In addition, the precluded party must have had a full and fair opportunity to litigate the claim in the earlier proceeding. *State ex. rel. Children, Youth and Families Dept. v. Scott C.*, 365 P.3d 27, 31 (N.M. Ct. App. 2015). Claim preclusion may apply to default judgments.[15]

Each of these claim preclusion elements have been satisfied to give preclusive effect to Mr. and Mrs. Sanders's claim on the debt represented by the Default Judgment. There is an identity of parties and an identity of capacity or character of persons for or against whom the claim is made in both the State Court Action and this adversary proceeding. The cause of action (claim) on the debt (although not the dischargeability cause of action) are the same. And importantly, the same subject matter element is satisfied. The Default Judgment is based solely on the same series of connected transactions underlying Mr. and Mrs. Sanders's claim of non-dischargeability. Those transactions consist of the purchase and sale of the Mobile Home, Mr. and Mrs. Crespin's failure and inability to deliver title to the Mobile Home free and clear of liens, and the representations and warranties Mr. and Mrs. Crespin made to Mr. and Mrs. Sanders relating to the sale transaction.

---

[14] Mr. and Mrs. Crespin do not argue that any of the exceptions to application of claim preclusion apply other than inapplicability of the doctrine in dischargeability proceedings.

[15] *See First State Bank v. Muzio*, 666 P.2d 777, 780 (N.M. 1983), overruled in part on other grounds by *Huntington Nat'l Bank v. Sproul*, 861 P.2d 935 (N.M. 1993) ("We adopt the well-settled rule of law expressed in other jurisdictions which states that a prior default judgment bars a subsequent suit on issues which were, or could have been, determined in the earlier action."); *Moffat v. Branch*, 118 P.3d 732, 738 (N.M. Ct. App. 2005) (recognizing that res judicata [claim preclusion] may apply to default judgments); *In re Griego*, 64 F.3d 580, 584 (10th Cir. 1995) ("Even if it were a default judgment, however, res judicata would still apply.").

- 18 -

Finally, there is no evidence that Mr. and Mrs. Crespin did not have a full and fair opportunity in the State Court Action to answer the complaint and defend on the merits. Therefore, the Court will give claim preclusion effect to the Default Judgment to establish the existence and amount of the debt.

C.     The debt is non-dischargeable under § 523(a)(2)(A)

Finally, the Court will address whether the debt established by the Default Judgement is dischargeable under bankruptcy law, a matter within its exclusive jurisdiction. Section 523(a)(2)(A) provides that a debtor is not discharged from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by "false pretenses, a false representation, or actual fraud other than a statement respecting the debtor's or an insider's financial condition." To sustain a claim for false representation under § 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: "[(1) t]he debtor made a false representation; [(2)] the debtor made the representation with the intent to deceive the creditor; [(3)] the creditor relied on the representation; [(4)] the creditor's reliance was [justifiable];[16] and [(5)] the debtor's representation caused the creditor to sustain a loss." *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996). *Accord In re Sturgeon*, 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013). Intent to deceive can be inferred from the totality of the circumstances. *Copper v. Lemke (In re Lemke),* 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young,* 91 F.3d at 1375).

Section 523(a)(2)(A) also renders debts non-dischargeable where all of the above elements are met except the debt was obtained by false pretenses instead of a false representation. *See Sturgeon*, 496 B.R. at 223. "False pretenses are implied misrepresentations intended to create and

---

[16] *See Field v. Mans*, 516 U.S. 59, 60, 116 S. Ct. 437, 133 L.Ed.2d. 351 (1995) (changing the standard of reliance under 11 U.S.C. § 523(a)(2)(A) from "reasonable" to "justifiable."); *In re Riebesell*, 586 F .3d 782, 792 (10th Cir.2009) (same).

- 19 -

foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions." *Id*.

Here, Mr. and Mrs. Crespin created and fostered the false impression that Mr. and Mrs. Sanders were taking no material risk by paying the entire purchase price for the Mobile Home before receiving clear title from Mr. and Mrs. Crespin. Mr. and Mrs. Crespin intentionally created and fostered the false impression with intent to deceive Mr. and Mrs. Sanders so Mr. and Mrs. Sanders would pay them the purchase price for the Mobile Home. The facts that title to the Mobile Home was encumbered by a lien approximately twice the value of the Mobile Home, Green Tree had refused to release its lien without payment of the Note in full, Mr. and Mrs. Crespin had bad credit, and Mr. and Mrs. Crespin's plan was to obtain a construction loan to build their dream house to obtain funds to pay off the Note, were certainly material information. Mr. and Mrs. Crespin's withholding of that information was a material omission. Throughout the transaction, Mr. and Mrs. Crespin acted as if they would have no problem conveying clear title to the Mobile Home within 60 days of the time Mr. and Mrs. Sanders paid the purchase price. Mr. and Mrs. Crespin even went so far as including language in each of the transaction documents stating that Mr. and Mrs. Crespin had "good and legal title" to the Mobile Home, "full authority to sell" the Mobile Home, and that Mr. and Mrs. Crespin would sell the Mobile Home "free and clear of all liens, encumbrances, liabilities and adverse claims of every nature and description whatsoever." Exhibit 11, ¶ 3; Exhibit 12, ¶ 3; Exhibit 13, ¶ 3. Mr. and Mrs. Crespin further fostered Mr. and Mrs. Sanders's false impression by adding paragraph 5 to the Receipt promising such clear title would be delivered in 60 days.

Mr. and Mrs. Crespin intended to retain a company to help them improve their credit, and believed they would be able to repair their credit, obtain the construction loan, and free up title to

- 20 -

the Mobile Home. However, that does not excuse their failure to disclose or exonerate them of culpability. Mr. and Mrs. Sanders relied on the false impression created by Mr. and Mrs. Crespin. Mr. and Mrs. Sanders would not have paid the entire purchase price for the Mobile Home had they known of the undisclosed risk. The false impression created and fostered by Mr. and Mrs. Crespin caused Mr. and Mrs. Sanders to sustain loss because they relied on that false impression in paying the full purchase price for the Mobile Home. Approximately a decade later, Mr. and Mrs. Sanders have not received title to the Mobile Home, are unable to sell it and are at risk of losing possession of it to Green Tree.

Mr. and Mrs. Sanders have also satisfied the fourth element: requiring that the reliance was justifiable. "The appropriate standard is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." *In re Riebesell*, 586 F.3d 782, 791 (10th Cir. 2009). "Even under the 'justifiable' test, however, the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it." *Field*, 516 U.S. at 76, 116 S. Ct. at 446, 133 L. Ed. 2d 351. In other words, a creditor's reliance is not justifiable where the creditor "blindly relies" on a misrepresentation that would have been apparent if the creditor had only performed a perfunctory inquiry. As part of the subjective analysis, the court must consider the particularities of the creditor, including his level of sophistication, intelligence, and experience. *See In re Salma*, No. 09-30863 TEC, 2010 WL 4724252, at *3 (Bankr. N.D. Cal. Nov. 15, 2010) ("Justifiable reliance is a subjective test that turns on the qualities and characteristics of the particular plaintiff, including the plaintiff's level of sophistication and intelligence, and the circumstances of the

- 21 -

particular case.").[17]  In *In re Edgewater Place, Inc.*, the court described a "key difference" between an objective reasonable standard and the subjective justifiable standard as follows: "under the justifiable reliance standard, close attention must be paid to the individual plaintiff's sophistication, experience and competence."  *In re Edgewater Place, Inc.*, No. ED CV 98-281 RT, 1999 WL 35136576, at *5 (C.D. Cal. May 18, 1999)

Mr. and Mrs. Sanders justifiably relied on Mr. and Mrs. Crespin's implied representation that Mr. and Mrs. Sanders were not taking a material risk by paying the entire purchase price of the Mobile Home before receiving title.  Mr. and Mrs. Sanders were unsophisticated regarding this type of transaction.  Real property searches generally do not disclose liens against titled personal property, such as the Mobile Home.[18]  Mr. and Mrs. Sanders did not perceive any possible problems prior to closing the transaction because Mr. and Mrs. Crespin appeared to Mr. and Mrs. Sanders to be honest and trustworthy.  They met with Mr. and Mrs. Crespin several times, and chatted about Mr. and Mrs. Crespin's plan to build their dream home.  Mr. and Mrs. Sanders were assured title to the Mobile Home would be delivered within 60 days.  They believed Mr. and Mrs. Crespin's needed time to do paperwork to put the title in their name.  There was nothing that would be made apparent from a cursory investigation to create a red or even a yellow flag.

The non-dischargeable debt is the amount of damages arising from the non-dischargeable conduct.  *See Cohen v. de la Cruz*, 523 U.S. 213, 222, 118 S. Ct. 1212, 1218, 140 L. Ed. 2d 341 (1998) ("§ 523(a)(2)(A) bars the discharge of all liability arising from fraud.").  The only injury for which Mr. and Mrs. Sanders sought redress in the State Court Action was the loss they suffered

---

[17]  *In re Momoh*, No. 14-00291, 2016 WL 270155, at *4 (Bankr. D.D.C. Jan. 20, 2016), reconsideration denied sub nom. *Momoh*, No. 14-00291, 2016 WL 1417930 (Bankr. D.D.C. Apr. 8, 2016) ("Plaintiff's lack of sophistication is important in determining whether reliance was reliable.")

[18]  N.M. Stat. Ann. § 66-3-201(A) ("A security interest in a vehicle of a type required to be titled and registered in New Mexico is not valid against attaching creditors, subsequent transferees or lienholders unless perfected as provided by this section.")

from payment to Mr. and Mrs. Crespin of the purchase price for the Mobile Home, the undisclosed third party encumbrance against the home greatly in excess of its value, and Mr. and Mrs. Crespin's inability to deliver title free of that encumbrance. The non-dischargeable conduct caused the loss for which the Default Judgment quantified and awarded damages. Therefore, the debt Mr. and Mrs. Crespin owe Mr. and Mrs. Sanders under the Default Judgement is same debt the Court has found to be excepted from the discharge. Accordingly, the full amount of the Default Judgment is excepted from discharge under § 523(a)(2)(A) as a debt obtained by false pretenses.

Because the Court concludes that the debt is non-dischargeable under § 523(a)(2)(A) it need not address Mr. and Mrs. Sanders's claims that the debt is non-dischargeable under §§ 523(a)(4) and (6).

D.     Treble Damages Awarded in the Default Judgment

The Default Judgment includes an award of treble damages under the New Mexico Unfair Practices Act ("UPA"), N. M. S. A. 1978, § 57-12-1 et seq. However, the UPA does not apply to the purchase and sale of the Mobile Home on which the Default Judgment is based. That sale was an isolated consumer transaction. One of the requirements for the UPA to apply is that "the conduct complained of must have occurred in the regular course of the [defendant's] trade or commerce." *Stevenson v. Louis Dreyfus Corp.*, 881 P.3d 1308, 1311 (N.M. 1991). *See also Lohman v. Daimler Chrysler Corp*, 166 P.3d 1091, 1092 (N.M. Ct. App. 2007) (for a sale of goods to be subject to the Unfair Practices Act, the sale must have been in the regular course of business).

Mr. and Mrs. Crespin have a motion for relief from the Default Judgment pending in the State Court Action that was stayed by commencement of this bankruptcy case. Upon entry of an order excepting the debt from discharge, neither the automatic stay nor a bankruptcy discharge injunction will impede continuation of the State Court Action with respect to the debt excepted

- 23 -

from the discharge. It is up to the state court, not this Court, to decide whether to grant relief from the Default Judgment on the ground that the trebling of damages was based on an inapplicable statute. If the state court sets aside or grants other relief from the Default Judgment, any subsequent judgment entered in the State Court Action in favor of Mr. and Mrs. Sanders and against Mr. and Mrs. Crespin will be excepted from Mr. and Mrs. Crespin's bankruptcy discharge so long as the judgment is based only on the same series of connected transactions underlying Mr. and Mrs. Sanders's claim of non-dischargeability in this adversary proceeding.

## CONCLUSION

Based on the foregoing, the Court will enter an order excepting the Default Judgment from discharge under 11 U.S.C. § 523(a)(2)(A).

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: June 15, 2016

Copy to:

Scott E Turner
The Turner Law Firm, LLC
500 Marquette Ave., N.W. Suite 1480
Albuquerque, NM 87102-5325

Michael K Daniels
PO Box 1640
Albuquerque, NM 87103-1640